UNITED STATES of America, Plaintiff,

v.

Dennis LEE, Roger Kelley, a/k/a "Tito," Candace Mullins, Defendants.

Nos. 96–40055–01–SAC, 96–40055–02–SAC, 96–40055–03–SAC.

United States District Court, D. Kansas.

May 28, 1997.

Eric Kjorlie, William K. Rork, Rork Law Office, James C. Heathman, Heathman, Heathman & Kelly, Topeka, KS, for Dennis Lee.

Joseph D. Johnson, Topeka, KS, for Roger Kelley.

Roger Kelley, Carbondale, KS, pro se.

Marilyn M. Trubey, David J. Phillips, Office of Federal Public Defender, Topeka, KS, for Candace Mullins.

Candace Mullins, Burlingame, KS, pro se.

Gregory G. Hough, Thomas G. Luedke, Office of United States Attorney, Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, District Judge.

On July 24, 1996, the grand jury returned a four count indictment charging Dennis Lee, Roger Kelley and Candace Mullins with conspiracy to possess, manufacture or attempt to manufacture, with the intent to distribute in excess of one kilogram of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 21 U.S.C. § 846. In Count 2, the indictment charges Dennis Lee with manufacturing or attempting to manufacture with the intent to distribute in excess of one kilogram of methamphetamine. In Count 3, the indictment charges both Dennis Lee and Roger Kelley with possession with intent to distribute in excess of one hundred grams of methamphetamine. Count 4 charges Candace Mullins with committing perjury before the grand jury in violation of 18 U.S.C. § 1623.

This case comes before the court upon the following pretrial motions:

**Motions filed by Dennis Lee (represented by Eric Kjorlie (initially represented by William K. Rork) [1]):**

1. Defendant Dennis Lee's Motion to Join in Motions of Defendant Mullins (Dk.80).

---

1. Several discovery motions filed by Rork on behalf of Lee were denied for failure to comply with the *Criminal Procedural Guidelines* adopted by this court.

2. Motion to join in Motions of Defendant Mullins (Dk.50).

3. Defendant Dennis Lee's Motion to Join in Motions of Defendant Dennis Lee by his Previous Counsel of Record (Dk.79).

4. Defendant Dennis Lee's Motion to Suppress Evidence [FRCP 12, 41(c), 41(e), 41(f) ] (Dk.81).

5. Motion for Discovery of Rule 404(b) evidence and for hearing on Rule 404(b) evidence outside the presence of the jury and in limine (Dk.53).

6. [Motion for] Bill of Particulars (Dk.49).

**Motions filed by Roger Kelley (represented by Joe Johnson):**

None Pending [Two Motions Previously Denied]

**Motions filed by Candace Mullins (represented by Marilyn Trubey):**

1. Motion to compel discovery regarding informants (Dk.42).

2. Motion to compel disclosure of existence and substance of promises of immunity, leniency or preferential treatment (Dk.40).

3. Motion for Disclosure by Government (Dk.41).

4. Motion to suppress statement (Dk.43).

5. Motion to suppress evidence (Dk.44).

The government has filed responses to the defendants' motions. *See* (Dk. 60, 63 and 85).

**Defendant Dennis Lee's Motion to Join in Motions of Defendant Mullins (Dk.80); Motion to join in Motions of Defendant Mullins (Dk.50); Defendant Dennis Lee's Motion to Join in Motions of Defendant Dennis Lee by his Previous Counsel of Record (Dk.79).**

The defendant seeks to join in the motions filed by Mullins. This motion is granted subject to the limitations set forth in this court's criminal procedural guidelines. *See Criminal Procedural Guidelines*, I.F. "A motion to join another party's motion will be granted only upon the following conditions. The joining party will not be allowed to raise any legal or factual arguments that are additional to or different from those found in the original motion, unless they are advanced in the motion to join. Issues, such as prejudice, standing, fairness, or need, that are unique to the party seeking to join must be made in the written motion to join or the court will deem them to have been waived."

The defendant also seeks to join in the motions filed by his previous counsel. This motion is granted.[2]

**Defendant Dennis Lee's Motion to Suppress Evidence [FRCP 12, 41(c), 41(e), 41(f) ] (Dk.81).**

In this motion, Lee seeks an order suppressing from evidence all property seized as a result of the execution of a search warrant dated November 16, 1995. Lee also apparently seeks to suppress from evidence items seized as a result of another search of a Corvette pursuant to a search warrant. In support of his contention that the evidence should be suppressed, Lee argues that the warrants are insufficient on their face, that the information contained in the application is insufficient to establish probable cause, that the information contained within the affidavit in the application was based upon uncorroborated hearsay testimony from an unidentified informant, that the officer applying for the search warrant misstated the evidence, and that the information in the application was stale.

Attached to Lee's motion are two affidavits, one from the defendant's attorney. In that affidavit, Kjorlie recounts information supplied to him by Lee. The other affidavit is from Lesley A. Winblad, a person upon whom Special Agent Dixon obtained some of the information serving as the basis for probable cause to obtain the search warrants. Winblad challenges portions of SA Dixon's affidavit, stating that she believes "that in view of [her] mental state, that I was taken advantage of and that my statements attributable to me in the search warrant Affidavit were totally confused and taken out of context for improper use by Special Agent Dixon in his application for search warrant, which I have only first read on this date."

2. The court has previously disposed of several motions filed by Lee's first attorney, Rork. The court disposes of those motions in the same manner previously decided.

The government responds, opposing the defendant's motion. The government contends that the search warrant was supported by sufficient, reliable information to establish probable cause. The government contends that the defendant has made an insufficient showing to warrant a *Franks* hearing. The government contends that none of the information submitted by the defendant, even if true, is "clearly critical" to the finding of probable cause to issue both warrants. The government contends that there is no evidence that SA Dixon lied—instead the defendant's challenges are the benefit of perfect hindsight and are therefore not a basis for relief. The government contends that even if the portions of the applications for the search warrants that are challenged by the defendant as false are stricken, the application nevertheless retains sufficient information to establish probable cause.

### Applicable Law [3]

██ Generally, a search must be made pursuant to a warrant based on probable cause. U.S. Const. amend. IV. In deciding a suppression motion based upon the asserted failure of the affidavits to provide probable cause for the warrant, the reviewing court must remember that the magistrate is permitted to draw reasonable inferences from the affidavits and that the magistrate's determination is accorded great deference. *See United States v. Edmonson,* 962 F.2d 1535, 1540 (10th Cir.1992); *United States v. Peveto,* 881 F.2d 844, 850 (10th Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). When reviewing a magistrate's issuance of a search warrant the court must determine whether the magistrate had a substantial basis for concluding that probable cause existed. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). The magistrate must make a practical, common-sense determination from the totality of the circumstances presented whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.* at 238, 103 S.Ct. at 2332. "In applying the test enunciated in *Gates,* this Court has stated that the 'affida-

vit' should be considered in a common sense, nontechnical manner ..." *Edmonson,* 962 F.2d at 1540 (*quoting United States v. Massey,* 687 F.2d 1348, 1355 (10th Cir.1982) (citation omitted)).

██ "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates,* 462 U.S. at 232, 103 S.Ct. at 2329. The Supreme Court has found it sufficient to say that probable cause is more than a mere suspicion, but considerably less than what is necessary to convict someone. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *see United States v. Wicks,* 995 F.2d 964, 972 (10th Cir.) ("The existence of probable cause is a 'common-sense standard' requiring 'facts sufficient "to warrant a man of reasonable caution in belief that an offense has been committed." '") (quoting *United States v. Mesa–Rincon,* 911 F.2d 1433, 1439 (10th Cir. 1990) (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)), *cert. denied,* 510 U.S. 982, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993)). Hearsay, even multiple hearsay, may be used to establish probable cause for a search warrant. *U.S. v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 874 n. 3 (10th Cir.1992).

 In *Gates,* the Supreme Court abandoned the requirement that an officer set forth an informant's reliability in the affidavit. 462 U.S. at 238, 103 S.Ct. at 2332. The courts are to determine an informant's credibility or reliability and basis of knowledge under a flexible totality of circumstances standard. *United States v. Smith,* 63 F.3d 956, 961 (10th Cir.1995), *cert. granted and vacated on other grounds,* —— U.S. ——, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996). "Veracity and basis of knowledge are not, however, rigid and immovable requirements in the finding of probable cause. A deficiency in one element may be compensated for 'by a strong showing as to the other, or by some other indicia of reliability.'" *United States*

---

**3.** "When a search is state in character, 'the warrant and affidavits need only conform to federal constitutional requirements in order for the resulting evidence to be admissible in a federal

prosecution.'" *United States v. Morehead,* 959 F.2d 1489, 1497 (10th Cir.1992) (quoting *United States v. Gibbons,* 607 F.2d 1320, 1325 (10th Cir.1979) (citations omitted)).

*v. Corral,* 970 F.2d 719, 727 (10th Cir.1992). Consequently, the affiant need not declare the informant's reliability when the informant's statements are corroborated by extrinsic information. *United States v. Sturmoski,* 971 F.2d 452, 457 (10th Cir.1992); *see United States v. Smith,* 63 F.3d at 961.

The evidence to support probable cause must be particularized to the defendant for which the warrant is being sought. *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979).

> It is not necessary, however, that the affidavit indicate that the evidence sought will undoubtedly be found in the place to be searched. Rather, it is only necessary that the facts and circumstances described in the affidavit warrant a man of reasonable caution to believe that such evidence is located at the premises or location to be searched.

*United States v. Johnson,* 645 F.2d 865, 867–68, (10th Cir.), *cert. denied,* 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981).

In *United States v. Reyes,* 798 F.2d 380 (10th Cir.1986), the defendant, who sought to suppress an audio cassette tape seized from his residence, contended that the information in the affidavit used to secure the search warrant contained no specific link to his residence. The Tenth Circuit rejected the defendant's argument:

> The affidavit did indicate that participants in the conspiracy maintained records regarding their activities. It is reasonable to assume that certain types of evidence would be kept at a defendant's residence and an affidavit need not contain personal observations that a defendant did keep such evidence at his residence.

798 F.2d at 382.

### Challenges to the Factual Truthfulness of Affidavit Supporting Search Warrant

In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held:

> [w]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and

> if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155–56, 98 S.Ct. at 2676. Under *Franks,* the burden is on the movant to demonstrate deliberate falsity or reckless disregard for the truth by the affiant, supported by an offer of proof. *United States v. $149,442.43 in U.S. Currency,* 965 F.2d at 874.

### Need for a *Franks* Hearing

In *Franks,* the Supreme Court set forth the legal standard for determining if a defendant is entitled to an evidentiary hearing to examine the factual truthfulness of an affidavit:

> In sum, and to repeat with some embellishment what we stated at the beginning of this opinion: There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, *and those allegations must be accompanied by an offer of proof.* They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant,

not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks,* 438 U.S. at 171–72, 98 S.Ct. at 2684; *see Matter of Search of 1638 E. 2nd St., Tulsa, Okl.,* 993 F.2d 773, 775 (10th Cir.) (to qualify for a *Franks* hearing, defendant must have made a substantial showing that the affiant knew of, or recklessly disregarded, the falsity of the informant's information), *cert. denied,* 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993). The Tenth Circuit has "extended *Franks* to hold that it is a Fourth Amendment violation to knowingly or recklessly omit from an affidavit information that would have vitiated probable cause." *United States v. Knapp,* 1 F.3d 1026, 1029 (10th Cir.1993) (citing *Stewart v. Donges,* 915 F.2d 572, 582–83 (10th Cir.1990)).

### Analysis

■■■■ The court finds that the search warrant was supported by probable cause and that there is no showing that SA Dixon materially omitted facts from his affidavits submitted in application for the search warrants. Lee correctly observes that "[p]robable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Snow,* 919 F.2d 1458, 1459 (10th Cir.1990) (citing *United States v. Shomo,* 786 F.2d 981, 983 (10th Cir.1986)). However, "the determination of timeliness depends not merely on the passage of time but on the nature of the criminal activity, the length of the activity, and the nature of the property seized." *United States v. Smith,* 63 F.3d 956, 960 (10th Cir. 1995). "Ongoing and continuous activity makes the passage of time less critical." *Snow,* 919 F.2d at 1460; *see United States v. Pace,* 981 F.2d 1123, 1133 (10th Cir.1992) (when the affidavit contains information of an

ongoing criminal activity, the passage of time is not as significant), *cert. denied,* 507 U.S. 966, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993); *Sturmoski,* 971 F.2d at 457 ("The offense in question was ongoing and continuing. Therefore the passage of time is not of critical importance."); *U.S. v. $149,442.43 in U.S. Currency,* 965 F.2d at 873. Lee allegedly made regular sales of methamphetamine since August of 1994. Considering the apparent ongoing nature of Lee's criminal enterprise, the passage of a few days was not significant. *See Reyes,* 798 F.2d at 382 (information not stale although lapse of five months between alleged criminal activity and issuance of search warrant). In short, under the totality of the circumstances, the issuing court had a substantial basis for determining that there was probable cause to issue the search warrant. In any event, the court is satisfied that the evidence seized from the execution of the search warrant is clearly admissible under the "good-faith" exception recognized by the Supreme Court in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).[4]

■■■■ Lee has not demonstrated that SA Dixon omitted material information from the search warrant application. Assuming, *arguendo,* that SA Dixon intentionally or recklessly included or omitted the information which Lee claims should have been included or deleted in his affidavit, the inclusion or deletion of that information would not have vitiated the numerous other facts supporting probable cause. The other information "omitted" or "included" in SA Dixon's affidavit would largely have been inconsequential to the issuing judge's probable cause determination.

**Motion for Discovery of Rule 404(b) evidence and for hearing on Rule 404(b) evidence outside the presence of the jury and in limine (Dk.53); Motion for Disclosure by Government (Dk.41).**

Both Mullins and Lee seek disclosure of information the government intends to offer

---

4. In *Leon,* the Supreme Court held that evidence seized under a search warrant later determined to be invalid may be admissible if the officers executing the warrant acted in good faith and with objectively reasonable reliance on the search warrant. *See United States v. Corral–Corral,* 899 F.2d 927, 932–933 (10th Cir.1990) (summarizing the law concerning the "good-faith" exception recognized in *Leon* ).

pursuant to Fed.R.Evid. 404(b). The defendants also request a hearing outside the presence of the jury to determine the admissibility of such evidence.

The government responds, disclosing the general nature of the evidence it plans to introduce. The government also indicates that the defendants have already been provided police reports regarding those incidents it plans to introduce.

In light of the government disclosure, the defendants' request for disclosure is denied as moot. In regard to the defendants' request for a hearing outside the presence of the jury to consider the admissibility of Rule 404(b) evidence, that request is granted. The government shall not mention Rule 404(b) evidence during voir dire or opening argument and shall not seek to introduce such evidence without first approaching the bench.

### [Motion for] Bill of Particulars (Dk.49).

The defendants seek a bill of particulars. The defendants contend that the bare assertions of criminal acts asserted in the indictment are insufficient to allow them to prepare an adequate defense.

The government opposes the motion, arguing that the defendant has not demonstrated that a bill of particulars is appropriate. The government argues that the defendant is using the motion for discovery purposes rather than to clarify the charges in the indictment.

### Bill of Particulars

"An indictment is sufficient 'if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.'" *United States v. Poole,* 929 F.2d 1476, 1479 (10th Cir.1991) (quoting *United States v. Staggs,* 881 F.2d 1527, 1530 (10th Cir.1989), *cert. denied,* 493 U.S. 1020, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990)). In the Tenth Circuit, it is usually enough for the indictment to track the statute when the statute adequately expresses all of the elements to the offense. *United States v. Dunn,* 841 F.2d 1026, 1029 (10th Cir.1988). An indictment is held only to minimal constitutional standards. *Edmonson,* 962 F.2d at 1541. The sufficiency of

an indictment is judged "by practical rather than technical considerations." *Id.* The district court has broad discretion in deciding a motion for bill of particulars. *Id.*

" 'The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense.' " *Dunn,* 841 F.2d at 1029 (quoting *United States v. Cole,* 755 F.2d 748, 760 (11th Cir.1985)). *See United States v. Ivy,* 83 F.3d 1266, 1281 (10th Cir.) ("The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense.") (quoting *United States v. Levine,* 983 F.2d 165, 166–67 (10th Cir. 1992)) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 253, 136 L.Ed.2d 180 (1996); *United States v. Kunzman,* 54 F.3d 1522, 1526 (10th Cir.1995). Though it may provide more information, a bill of particulars is not intended to serve as a discovery device or to compel the government's disclosure of the factual proof planned for trial. *Dunn,* 841 F.2d at 1029. Nor is it a way to require the government's explanation of the legal theories expected at trial. *United States v. Gabriel,* 715 F.2d 1447, 1449 (10th Cir.1983).

Based upon these standards, the defendants' request for a bill of particulars is denied. The indictment adequately apprises the defendants of the crimes charged. A comparison of the allegations in each count with those found in the case law establishes the sufficiency of the indictment. Under these circumstances, the defendants' need for a bill of particulars evaporates.

### Motion to compel discovery regarding informants (Dk.42).

The defendants seek discovery regarding the confidential informants in this case. The defendants also ask the government to "[m]ake reasonable efforts to produce the informants as witnesses at trial." The identity of the confidential informants is known to the defendants; the CI's are Leslie Winblad, Linda Lee and Debbie Woodruff.

The government responds, arguing that those persons named by the defendant are not confidential informants, but are instead persons who merely gave information after being interviewed. The government indicates that those persons were not employed by the government, but were simply persons who observed criminal acts by the defendants and then reported their observations to law enforcement officers. The government nevertheless agrees to disclose all of the information the defendants have requested under *Brady, Giglio* and the Federal Rules of Criminal Procedure at least five days prior to trial.

### *Roviaro* and the Confidential Informant

■ The Supreme Court in *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957), recognized the compelling public interest in favor of effective law enforcement and created a privilege that permits the government to withhold the identity of informants. *United States v. Mendoza–Salgado*, 964 F.2d 993, 1000 (10th Cir.1992). Though anonymity encourages and protects informants, the Supreme Court held that the privilege yields to fairness if the informant's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. at 628. A decision on disclosure of identity entails "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." 353 U.S. at 62, 77 S.Ct. at 628–29. Striking a proper balance depends on "the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.*

■ The burden is on the defendant to come forward with evidence establishing that the *Roviaro* criteria favor disclosure. *United States v. Blevins*, 960 F.2d 1252, 1258–59 (4th Cir.1992). More than suspicion or speculation is needed to meet the defendant's burden. *United States v. Williams*, 898 F.2d 1400, 1402 (9th Cir.1990). " 'The defendant must explain to the court as precisely as possible what testimony he thinks the informer could give and how this testimony would be relevant to a material issue of guilt or innocence.' " *Blevins*, 960 F.2d at 1259

(quoting 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 510[06] (1991)); *see also United States v. Ridley*, 814 F.Supp. 992, 996 (D.Kan.1993).

■ As a general rule, the Tenth Circuit requires disclosure when the informant's testimony "might be relevant to the defendant's case and justice would best be served by disclosure." *United States v. Reardon*, 787 F.2d 512, 517 (10th Cir.1986). In practice, the Tenth Circuit has not required disclosure "where the information sought 'would be merely cumulative,' or where the informer did not participate in the illegal transaction," *Mendoza–Salgado*, 964 F.2d at 1001 (quoting *United States v. Scafe*, 822 F.2d 928, 933 (10th Cir.1987)) (other citations omitted), where the informant is not a participant or witness to the crime, *United States v. Brantley*, 986 F.2d 379, 383 (10th Cir.1993), or where the informant is a mere tipster, *United States v. Wynne*, 993 F.2d 760, 766 (10th Cir.1993).

### Who is a CI?

Turning to the government's suggestion that the persons identified by the defendants are not CI's, the government relies upon *Gordon v. United States*, 438 F.2d 858, 874 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 63, 139, 140, 142, 143, 30 L.Ed.2d 56 (1971). In *Gordon*, the defendants argued that "anyone who participates in and furnishes information about a transaction is an informer," and that the district court erred in not excluding the testimony of certain witnesses because the government had filed a bill of particulars indicating that there were no "informers." The court of appeals rejected that definition of "informant."

> Such a broad definition fails to comprehend the reason for this functional classification. At common law, the prosecution in a criminal case was ordinarily privileged to withhold from an accused the identity of persons who furnished information relating to violations of the law. The privilege was founded upon public policy to protect effective law enforcement. As the Supreme Court explained in Roviaro v. United States:

The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

The scope of the privilege is limited by its underlying purpose * * * (O)nce the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

Generally speaking, therefore, an informer is an undisclosed person who confidentially volunteers material information of violation of the law to officers charged with enforcement of that law. As we understand the term, persons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of an investigation, are not informers. Moreover, a distinction is often made in the federal cases based on whether the person is an active participant in the offense with which the defendant is charged or is a "mere informer" who only supplies a "lead" to law enforcement officers for their investigation of the crime. According to this distinction, a participant in the transaction upon which the charge against the accused is based often is not treated as an informer. It follows, therefore, that the witnesses whose testimony was challenged were not informers. Rather than being "mere informers" supplying leads, these witnesses were actually involved in the financial transactions of the Five Points Bank. In addition, as far as the record shows, the witnesses did not confidentially volunteer information. They were approached and interrogated by law enforcement agents. In some instances the witnesses disclosed to several of the appellants that they were being interviewed by Government agents as well as the nature and content of the statements given to the investigating agents. Furthermore the Government furnished appellants with Jencks material containing the statements of each witness before they testified to that disclosure of identity was never a problem. And finally, in view of the length of the trial which lasted more than a month, it cannot be reasonably con-

tended that the appellants did not have ample opportunity to prepare their defenses on every aspect of the testimony. Thus we conclude that the appellants were not injured or surprised by this testimony.

438 F.2d at 875 (footnotes omitted).

In *United States v. Miller,* 499 F.2d 736 (10th Cir.1974), the government took the position that there were no informers in the case and affirmatively stated that position in the Omnibus Order and at a subsequent hearing. During the trial, the defendant cross-examined a witness named Maret, who indicated that he voluntarily furnished information to the F.B.I. The defendant sought to strike the entire testimony of the witness, arguing that Maret was an informer, contrary to previous statements made by government counsel. The Tenth Circuit disagreed.

Appellant defines an informer as a person who voluntarily furnishes information to authorities as contrasted to persons who merely supply information after being interviewed and after a request for that information has been made. Based on the fact that Maret voluntarily contacted the F.B.I., appellant says that he is an informer, notwithstanding that he never actually stated that he was.

We disagree with appellant's contention that the sole criterion for determining whether a witness is an informer is whether he comes forward voluntarily. True, *Gordon v. United States,* 438 F.2d 858 (5th Cir.1971) gives some limited support to this contention. However, the fact that the witness has come forward voluntarily should not in our view be the sole criterion for classifying him as an informer.

In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the alleged informer was an active participant in the illegal activity, and it was assumed in that case that this was an important criterion. The entire question in *Roviaro* was one of whether the government justifiably withheld the identity. The Court did

not deal directly with the issue of definition.[2]

2. In *Roviaro*, the government did not dispute that the undercover employee who participated in the narcotics transaction was, in fact, an "informer." Generally, the cases involving the use of informers are concerned with the government's privilege to withhold the identity of a paid government agent. In these cases the government has not argued that an agent should *not* be classified as an informer, so that a definition of the term "informer" has neither been sought by the parties nor expressed by the court. *See On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270, rehearing denied, 344 U.S. 848, 73 S.Ct. 5, 97 L.Ed. 659 (1952); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

. . . .

The voluntary submission of information or report of a crime to a government agency does not, without more, make an individual an informer in the absence of some connection between the individual and the government agency. To be an informer the individual supplying the information generally is either paid for his services or, having been a participant in the unlawful transaction, is granted immunity in exchange for his testimony. In the case at bar, there is no showing that the witness Maret was in complicity with the authorities. He was not in their employ. He may have hoped for advantage, but no such agreement was demonstrated.

Although the appellant sought to establish that the witness Maret had set him up, so to speak, he was unable to accomplish this. The trial court ruled that the government in the case at bar was not obligated to disclose Maret's identity. Our view is that there is no obligation to identify Maret as an informer because it does not appear that in the usual understanding of that term he occupied such a position.

499 F.2d at 741–42.

More recently, in *Wynne*, the defendant argued that a government witness who testified against him at trial as an "informer" should have been disclosed under *Roviaro*. The Tenth Circuit rejected that contention.

The government contends that Ms. Narro was merely a bystander to the events which occurred on the train platform, and was at more a mere tipster. We agree that Ms. Narro was not a government informant whose identity should have been disclosed. She was a "citizen-informer." *See* 1 Wayne R. LaFave, *Search and Sei-zure* § 3.3 at 611 ("[C]ourts have quite properly drawn a distinction between [the usual concept of a police informant] and the average citizen who by happenstance finds himself in the position of a victim of or a witness to criminal conduct and thereafter relates to the police what he knows as a matter of civic duty."). Ms. Narro testified at trial, subject to cross-examination. There was no evidence presented at trial that she had been contacted or employed in any way by the government prior to the circumstances which lead to Mr. Wynne's arrest. The testimony indicates nothing other than that the information she gave about Wynne was given out of civic duty.

Moreover, even if she *were* characterized as a government informant, the government had no duty to disclose Ms. Narro's identity under *Roviaro* because she was not a participant in the charged offense, and her testimony at trial was cumulative to that of Agent Candelaria. *See United States v. Mendoza-Salgado*, 964 F.2d 993, 1000–01 (10th Cir.1992).

993 F.2d at 766.

### Analysis

■ Based upon the criteria set forth above, it does not appear that any of the persons identified by the defendants as "CI's" are properly characterized as such under the criteria established by the Tenth Circuit. This court has rejected similar argument by this same counsel in other cases. The court also notes that the defendants do not suggest that they do not know the whereabouts of the confidential informants, nor do they allege that they are unable to subpoena either person under Fed.R.Crim.P. 17. "A defendant who knows the informer must show that he made a diligent attempt to locate him before relief will be ordered under *Roviaro*." *United States v. Turbide*, 558 F.2d 1053, 1060 n. 6 (2nd Cir.) *cert. denied sub nom.*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *see also Ridley*, 814 F.Supp. at 997 n. 3.

The defendants' motion is denied in part on the merits and in part as moot in light of

the disclosure the government intends to provide.

**Motion to compel disclosure of existence and substance of promises of immunity, leniency or preferential treatment (Dk.40).**

The defendants seek disclosure of promises of immunity, leniency or preferential treatment. The government acknowledges its obligations to disclose such information and agrees to do so at least five days prior to trial.

In light of the government's response, the defendants' motion is denied as moot.

**Motion to suppress statement (Dk.43).**

■■■ Candace Mullins was called to testify before the grand jury. Apparently based upon its conclusion that her testimony was untruthful, the grand jury charged Mullins with one count of perjury in addition to the drug conspiracy charge.

Mullins seeks to suppress the evidence of her statement, arguing that her testimony was coerced. In support of that contention, Mullins claims that her attorney, Cheryl Stewart, was informed during a telephone conversation with AUSA Tom Luedke that she was required to testify before the grand jury and that she would not be permitted to exercise her Fifth Amendment privilege against self-incrimination when testifying before the grand jury and that she could not consult with an attorney while testifying before the grand jury. Mullins apparently claims that when she appeared as subpoenaed to testify before the grand jury that she was told directly by AUSA Tom Luedke and other law enforcement officers that if she did not testify before the grand jury that she would be indicted along with Lee. Mullins claims that she was told that she could not have an attorney and was never advised of her Fifth Amendment right not to incriminate herself. Because she did not say what the government wanted to hear, she claims that she was indicted on the drug charges and for perjury.

The government challenges the facts asserted by Mullins. According to the government's brief:

At the time the defendant was served with a subpoena to testify before the grand jury in this matter she indicated that she wanted to talk to an attorney. At the time the subpoena was served the defendant was not a target or even the subject of the investigation. Due to her close relationship the target, Dennis Lee, it was suspected that she may have information related to his drug trafficking activity. After the defendant was served she did, in fact, talk with Sheryl Stewart, an attorney in Osage County. A day or two before the defendant was to appear and testify, the government's attorney was contacted by Ms. Stewart regarding the defendant's appearance. Ms. Stewart was advised that the defendant did not have to testify if she did not want to, however, she was required to appear on the subpoena. As a practical matter, Ms. Stewart was advised that if the defendant did not wish to testify, she need not appear. Ms. Stewart was also advised that she could accompany the defendant to the courthouse, but that she could not enter the grand jury proceedings. She was advised that she could wait outside and if the defendant had any questions, the proceedings would be interrupted and the defendant could consult with her. Ms. Stewart was told that if the defendant cooperated and was complete and honest in her testimony before the grand jury, she would not be prosecuted for participation in any drug related acts that might be revealed by her testimony. If she were not truthful before the grand jury she could be prosecuted for perjury and any other illegal acts uncovered by the investigation. At the close of this conversation the government's attorney requested that Ms. Stewart contact him prior to the grand jury convening to inform him of how the defendant wished to proceed. Ms. Stewart did not call back and on February 1, 1996, the defendant appeared to testify.

Prior to the defendant testifying she was advised that the point of the investigation was the (sic) to find the truth. She was advised that the only way she could get into trouble was if she was not truthful with the grand jury. During her testimony in the grand jury she was reminded that if she was not truthful, she could be prosecuted for perjury in addition to any drug related charges involving Mr. Lee.

The defendant grossly misstates the facts when she alleges that she was told that if she did not testify she would be indicted along with Mr. Lee. It is obvious also that no one told her she could not consult with an attorney prior to testifying before the grand jury. She did, in fact, consult an attorney prior to her testimony. Government's brief (Dk.60) at 3–5.

At the March 7, 1997, hearing, Mullins called Cheryl Stewart to testify regarding Stewart's telephonic conversation with AUSA Luedke. Stewart is a solo practitioner, focusing primarily on criminal and domestic matters. Although Stewart is licensed to practice in federal court, she has never actually appeared in federal court and had no personal experience with the grand jury process on either the state or federal level. Prior to Mullins' receipt of the grand jury subpoena, Stewart had represented Mullins on unrelated state matters. Although Stewart did not ever enter a formal agreement to represent Mullins, Stewart called Deputy Croucher and AUSA Luedke on her behalf regarding the grand jury subpoena. Stewart testified that in a telephonic conversation with AUSA Luedke, Luedke told her that Mullins could not invoke her Fifth Amendment privilege against self-incrimination and that she was therefore required to appear and testify whether she wanted to or not. Stewart also indicated that AUSA Luedke had stated that an attorney could not be appointed to consult with Mullins while she was testifying before the grand jury. Stewart indicated that she had passed this information on to Mullins.

Mullins did not testify at the March 7, 1997, hearing.

 Although the court could have relied in part on the proffer of AUSA Luedke contained in his written response to Mullins' motion, that response did not directly address all of the points implicated by Stewart's testimony. Moreover, in light of the conflict of testimony, the court believed it appropriate to consider the live testimony of AUSA Luedke rather than relying solely on his written proffer.[5] Consequently, the court issued an order requiring AUSA Luedke to testify regarding the following areas:

1. Prior to Mullins testifying before the grand jury, what did AUSA Luedke tell Cheryl Stewart regarding the subpoena issued to Mullins?

Specifically, did AUSA Luedke tell Stewart that Mullins could not assert her Fifth Amendment privilege against self-incrimination when testifying before the grand jury?

2. Prior to or during Mullins' testimony before the grand jury, what, if anything, did AUSA Luedke tell Mullins regarding her Fifth Amendment right to be silent? What, if anything, did AUSA Luedke tell Mullins about her right to consult with counsel before or while testifying before the grand jury?

At the April 4, 1997, hearing, Luedke categorically denied several of the statements

---

5. Contrary to Mullins' suggestion, the court did not abandon its role of impartial arbiter and assume the role of prosecutor in requiring the government to call AUSA Luedke as a witness. Even if this had been a trial setting, the court's act of requiring the government to call AUSA Luedke as witness would have been entirely appropriate:

The precepts of fair trial and judicial objectivity do not require a judge to be inert. The trial judge is properly governed by the interest of justice and truth, and is not compelled to act as if he were merely presiding at a sporting match. He is not a 'mere moderator.' As Justice Frankfurter put it, '(f)ederal judges are not referees at prize-fights but functionaries of justice.' *Johnson v. United States*, 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948) (dissenting in part). A federal trial judge has inherent authority not only to comment on the evidence adduced by counsel, but also—in appropriate instances—to call or recall and question witnesses. He may do this when he believes the additional testimony will be helpful to the jurors in ascertaining the truth and discharging their fact-finding function. What is required, however, are reins of restraint, that he not comport himself in such a way as to 'tilt' or overseer the jury or control their deliberations.

*United States v.Liddy*, 509 F.2d 428, 438 (D.C.Cir. 1974) (footnotes omitted), *cert. denied*, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975).

The fact that the court focused the scope of the government's inquiry is of no consequence, as the court could have posited those same questions from the bench. *See United States v. Albers*, 93 F.3d 1469, 1485 (10th Cir.1996) ("The trial judge's authority to question witnesses is, of course, beyond dispute. Fed.R.Evid. 614(b).").

made by Stewart during her March 7, 1997, testimony. Luedke denied telling either Stewart or Mullins personally that Mullins could not invoke her Fifth Amendment privilege while testifying before the grand jury. Although Luedke indicated that he had told Stewart that an attorney could not be present in the grand jury room while Mullins testified, Luedke denied telling either Stewart or Mullins personally that she could not request a recess while testifying before the grand jury to consult with an attorney. Luedke told Stewart that Mullins was not simply free to ignore the grand jury subpoena. However, as a practical matter, if Mullins did not intend to testify but instead intended to invoke her Fifth Amendment privilege against self-incrimination, "they could let us know" and avoid wasting her time and the grand jury's time. Luedke informed Stewart that the grand jury was only interested in the truth, and that if Mullins told the truth, the government had no interest in prosecuting Mullins.

Based upon his conversation with Stewart, Luedke was uncertain whether Mullins intended to honor the grand jury subpoena. When Mullins appeared as ordered by the subpoena, Luedke "took it from that that she had talked to Cheryl Stewart and she agreed to cooperate and she was going to come up here and testify." Mullins indicated to Luedke that he had in fact talked with Cheryl Stewart prior to her arrival. During her testimony before the grand jury, Mullins never indicated that she desired to invoke her Fifth Amendment privilege against self-incrimination or that she desired to consult with an attorney.

In short, Luedke denied making any incorrect or misleading statements regarding Mullins' constitutional rights. Luedke also denied making any threatening or coercive statements to Mullins prior to or during her testimony before the grand jury.

### Voluntariness

■■■■ "[A] defendant's statement that is extracted or induced by threats or promises is involuntary." *United States v. Hernandez*, 93 F.3d 1493, 1503 (10th Cir.1996) (citing *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203–04, 50 L.Ed.2d 194 (1976)). "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment...." *Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir.1993) (quoting *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992)).

It is well established that the Fifth Amendment protects against the admission of incriminating statements of all kinds, whether considered to be confessions or not. "No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any matter; it does not distinguish degrees of incrimination." *Miranda v. Arizona*, 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966). "'The privilege afforded not only extends to answers that would in themselves support a conviction ... but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute....'" *Malloy v. Hogan*, 378 U.S. 1, 11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653 (1964) (quoting *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951)). "'[T]he availability of the privilege ... [turns] upon the nature of the statement or admission and the exposure it invites.'" *United States v. Rogers*, 921 F.2d 975, 979 (10th Cir.) (quoting *In re Gault*, 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967)), *cert. denied*, 498 U.S. 839, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990); *see also Cooper v. Dupnik*, 963 F.2d 1220, 1236–38 (9th Cir.) (statements which could and probably would have been used against accused had he gone to trial in order to hinder any insanity defense were made in contravention of accused's right to remain silent), *cert. denied*, 506 U.S. 953, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992). Our Fifth Amendment cases consistently refer to incriminating "statements," and are not limited to "confessions" per se. *See, e.g., Short*, 947 F.2d at 1449; *Rogers*, 921 F.2d at 979; *United States v. Fountain*, 776 F.2d 878, 885 (10th Cir.1985).

*Id.* at 1542. "A coerced or involuntary statement, which violates a suspect's rights under the Fifth Amendment, is not admissible at trial for any purpose." *United States v. Guerro,* 983 F.2d 1001, 1003 (10th Cir.1993).

"The voluntariness of a confession is determined by considering the totality of the circumstances in which it was made." *United States v. Perdue,* 8 F.3d 1455, 1466 (10th Cir.1993) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). To determine voluntariness, the court must ask:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Perdue,* 8 F.3d at 1466 (quoting *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). In considering whether the defendant's confession and/or statement is one of free will, the courts look to several factors, including: the age, education, and intelligence of the defendant; the length of detention and questioning; whether *Miranda* warnings were given; the defendant's physical and mental characteristics; and the location of the questioning. *U.S. v. Chalan,* 812 F.2d 1302, 1307 (10th Cir.1987); *see U.S. v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). The court must also consider the conduct of the police officers and government agents. *Perdue,* 8 F.3d at 1466. "In no case, however, is any single factor determinative." *Chalan,* 812 F.2d at 1307.

### Testimony Before the Grand Jury

### Fifth Amendment

"The privilege against self-incrimination, of course, is applicable to grand jury proceedings." *United States v. Tokoph,* 514 F.2d 597, 605 (10th Cir.1975) (citing *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). "Under *Miranda,* a person in police custody has, of course, an absolute right to decline to answer any question, incriminating or innocuous, *see Michigan v. Mosley,* 423 U.S. 96 [96 S.Ct.

321, 46 L.Ed.2d 313] (1975), whereas a grand jury witness, on the contrary, has an absolute duty to answer all questions, subject only to a valid Fifth Amendment claim. And even when the grand jury witness asserts the privilege, questioning need not cease, except as to the particular subject to which the privilege has been addressed. *Cf. Id.,* at 103–104 [96 S.Ct., at 326]. Other lines of inquiry may properly be pursued." *United States v. Mandujano,* 425 U.S. 564, 580–81, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212 (1976).

> In this constitutional process of securing a witness' testimony [before the grand jury], perjury simply has no place whatever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative. The power of subpoena, broad as it is, and the power of contempt for refusing to answer, drastic as that is and even the solemnity of the oath cannot insure truthful answers. Hence, Congress has made the giving of false answers a criminal act punishable by severe penalties; in no other way can criminal conduct be flushed into the open where the law can deal with it.[3]

---

3. Congress' view was expressed in the legislative history of the statute relating to false declarations before a grand jury or court, 18 U.S.C. § 1623:

> "A subpoena can compel the attendance of a witness before a grand jury or at trial.... But only the possibility of some sanction such as a perjury prosecution can provide any guarantee that his testimony will be truthful." S.Rep. No. 91–617, p. 57 (1969).

> Similarly, our cases have consistently indeed without exception allowed sanctions for false statements or perjury; they have done so even in instances where the perjurer complained that the Government exceeded its constitutional powers in making the inquiry.

*Id.* at 576–77, 96 S.Ct. at 1776.

[A] witness sworn to tell the truth before a duly constituted grand jury will not be heard to call for suppression of false statements made to that jury, any more than

would be the case with false testimony before a petit jury or other duly constituted tribunal. In another context, this Court has refused to permit a witness to protect perjured testimony by proving a *Miranda* violation. In *Harris v. New York*, 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1] (1971), the Court held that notwithstanding a *Miranda* violation:

"(The Fifth Amendment) privilege cannot be construed to include the right to commit perjury." *Id.*, at 225 [91 S.Ct., at 645, 28 L.Ed.2d, at 4].

More recently, the Court reaffirmed this salutary principle:

"(T)he shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Oregon v. Hass*, 420 U.S. 714, 722 [95 S.Ct. 1215, 1221, 43 L.Ed.2d 570, 577] (1975).

*Id.* at 582–83, 96 S.Ct. at 1779–80.

## Sixth Amendment

▮▮▮ We have twice suggested, though not held, that the Sixth Amendment right to counsel does not attach when an individual is summoned to appear before a grand jury, even if he is the subject of the investigation. *See United States v. Mandujano*, 425 U.S. 564, 581 [96 S.Ct. 1768, 1778, 48 L.Ed.2d 212] (1976) (plurality opinion); *In re Groban*, 352 U.S. 330, 333 [77 S.Ct. 510, 513, 1 L.Ed.2d 376] (1957); *see also* Fed.R.Crim.P. 6(d). And although "the grand jury may not force a witness to answer questions in violation of [the Fifth Amendment's] constitutional guarantee" against self-incrimination, *[United States v.] Calandra, supra,* 414 U.S. [338], at 346, 94 S.Ct. [613], at 619 [38 L.Ed.2d 561 (1974)] (citing *Kastigar v. United States*, 406 U.S. 441 [92 S.Ct. 1653, 32 L.Ed.2d 212] (1972)), our cases suggest that an indictment obtained through the use of evidence previously obtained in violation of the privilege against self-incrimination "is nevertheless valid." *Calandra, supra,* 414 U.S. at 346 [94 S.Ct., at 619]; *see Lawn v. United States*, 355 U.S. 339, 348–350 [78 S.Ct. 311, 317–318, 2 L.Ed.2d 321] (1958); *United States v. Blue*, 384 U.S. 251, 255, n. 3 [86 S.Ct. 1416, 1419, n. 3, 16 L.Ed.2d 510] (1966).

*United States v. Williams*, 504 U.S. 36, 49, 112 S.Ct. 1735, 1743, 118 L.Ed.2d 352 (1992). *See In re Grand Jury Subpoena*, 97 F.3d 1090, 1093 (8th Cir.1996) (" 'Accordingly, a defendant's right to counsel when a grand jury appearance is at issue extends only to the right to consult counsel outside the grand jury room.' ") (quoting *United States v. Schwimmer*, 882 F.2d 22, 27 (2nd Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990)).

The Constitution does not prohibit every element which influences a criminal suspect to make incriminating admissions. *See Garner v. United States*, 424 U.S. 648 [96 S.Ct. 1178, 47 L.Ed.2d 370] (1976); *Beckwith v. United States*, 425 U.S. 341 [96 S.Ct. 1612, 48 L.Ed.2d 1] (1976); *Schneckloth v. Bustamonte*, 412 U.S. 218, 223–227 [93 S.Ct. 2041, 2045–2047, 36 L.Ed.2d 854] (1973). Of course, for many witnesses the grand jury room engenders an atmosphere conducive to truth telling, for it is likely that upon being brought before such a body of neighbors and fellow citizens, and having been placed under a solemn oath to tell the truth, many witnesses will feel obliged to do just that. But it does not offend the guarantees of the Fifth Amendment if in that setting a witness is more likely to tell the truth than in less solemn surroundings. The constitutional guarantee is only that the witness be not compelled to give self-incriminating testimony. The test is whether, considering the totality of the circumstances, the free will of the witness was overborne. *Rogers v. Richmond*, 365 U.S. 534, 544 [81 S.Ct. 735, 741, 5 L.Ed.2d 760] (1961).

*United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977).

## Analysis

▮▮▮ In this case, the court concludes that Mullins' statements before the grand jury were voluntary. The Supreme Court has made it clear that the failure to provide Mullins with *Miranda* warnings prior to testifying before the grand jury does not render

her statements involuntary. Nor would the failure to give such warnings be a license to commit perjury.

Turning to Mullins' allegations of improper government conduct, the court finds the testimony of AUSA Luedke substantially more credible than the testimony of Stewart. Luedke appears regularly before this court and has consistently distinguished himself for honesty and candor to the court. In other cases, even counsel for the defendant has commented favorably on the candor of AUSA Luedke. The court finds no credible evidence that AUSA Luedke misstated the law regarding Mullins' constitutional rights to either Stewart or Mullins. Mullins' statements to the grand jury, perjurious or not, were voluntary.

In sum, the court finds no credible evidence that AUSA Luedke affirmatively mislead Mullins or her attorney regarding her obligation to respond to the grand jury subpoena or her ability to invoke her Fifth Amendment privilege against self-incrimination or her right to consult with counsel. Nor was Mullins' testimony the product of unfulfilled promises or coercive government conduct. Mullins motion to suppress her statements before the grand jury is denied.

**Motion to suppress evidence (Dk.44).**

■ Mullins seeks to suppress evidence of a book (a methamphetamine cookbook) "illegally obtained" from her mother, Cherry Miller. According to Mullins, after she was appointed counsel in this case (the Federal Public Defender), Mullins was released on bond on the condition that she live with her parents. According to Mullins, on August 26, 1996, Deputy Croucher went to Mullins' parents' house. According to Mullins, Deputy Croucher demanded to see Mullins. However, she was not at home. Mullins argues that this violated Mullins' Sixth Amendment right to counsel, and the fruits of such an attempted contact should be suppressed.

■ In addition to the Sixth Amendment violation, Mullins argues that Deputy Croucher coerced her ill mother into giving the cookbook to him. At the time of the request, Cherry Miller was watching the defendant's young child. Based upon the coercive tactics of the Deputy, Mullins argues that the consent to obtain the book was not freely given.

The government opposes the defendant's motion. The government argues that Deputy Croucher did not go to the house with the intent to contact Mullins. Instead, based upon a tip from a "tipster," he was going there to obtain the methamphetamine cookbook. The government argues that because Deputy Croucher did not contact the defendant, no violation of her Sixth Amendment rights occurred. Alternatively, the government argues that there is no case law supporting the defendant's apparent argument that a failed "attempt" to contact the defendant would serve as a basis for suppressing the evidence.

In regard to Mullins' Fourth Amendment arguments, the government indicates that Cherry Mullins voluntarily turned the book over to him. The government denies that Cherry Mullins' act was the product of coercion. The book was found in a diaper bag. The government contends that its acquisition of the book was the product of a valid third party consent to search and seize. Based upon the fact that Cherry Mullins was watching the young child, the government contends that Deputy Croucher could reasonably have believed that the Cherry Mullins had custody and control of the bag.

### Attempted Inappropriate Contact With Defendant

■ "Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Patterson v. Illinois* 487 U.S. 285, 290 n. 3, 108 S.Ct. 2389, 2393 n. 3, 101 L.Ed.2d 261 (1988).

The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated

whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. *See [United States v.] Henry,* 447 U.S. [264], at 276 [100 S.Ct. 2183, at 2189, 65 L.Ed.2d 115 (1980)] (POWELL, J., concurring). However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985).

## Consensual Searches

■■■■ A warrantless search of a suspect's premises is unreasonable per se under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent. *United States v. Butler,* 966 F.2d 559, 562 (10th Cir.1992). Whether a consent to search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined by the totality-of-the-circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). In determining whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant. *United States v. McCurdy,* 40 F.3d 1111, 1119 (10th Cir.1994). Evidence obtained by a consent-based search is admissible only if the government (1) produces clear and positive testimony that the consent was unequivocal, specific, and freely given, and (2) proves that the consent was given without duress or coercion, express or implied. *Butler,* 966 F.2d at 562.

*United States v. Glover,* 104 F.3d 1570, 1583–84 (10th Cir.1997)

## Validity of Third Party's Consent

■■■■ The law is well-settled that a warrantless entry and search by law enforcement officers does not violate the Fourth Amendment's proscription of "unreasonable searches and seizures" if the officers have obtained the consent of a third party who possesses common authority over the premises. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). "The common authority justifying the consent need only rest 'on the mutual use of the property by persons having joint access or control for most purposes.'" *United States v. Sealey,* 830 F.2d 1028, 1031 (9th Cir.1987) (quoting *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7). In *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the Supreme Court recently held that a warrantless entry by law enforcement officers is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believe to possess common authority over the premises, but who in fact does not have such authority.

In *United States v. Salinas–Cano,* 959 F.2d 861 (10th Cir.1992), the Tenth Circuit recently considered the issue of whether the defendant's girl-friend had common authority over a suitcase owned by the defendant. After a controlled buy with the defendant, the police went to the defendant's girlfriend's apartment and asked permission to search it. The girlfriend consented to the search and lead the police to the defendant's belongings. During a search of the defendant's closed but unlocked suitcase a quantity of cocaine was found.

At the suppression hearing, the police officer conceded that he did not have probable cause to open the suitcase. It was also undisputed that the police officer knew that the suitcase he searched belonged to the defendant, as the girlfriend specifically told the police officer that the suitcase belonged to the defendant.

■■■■ The defendant entered a conditional plea of guilty to possession with intent to distribute. On appeal, the defendant con-

ceded that the girlfriend could give consent to search the apartment, but argued that she did not have authority to consent to the search of the suitcase. The Tenth Circuit agreed and reversed the district court.

> "A privacy interest in a home itself need not be coextensive with a privacy interest in the contents or movements of everything situated inside the home.... *A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home.... [W]hen a guest in a private home has a private container to which the homeowner has no right of access.... the homeowner ... lacks the power to give effective consent to the search of the closed container."*

*United States v. Karo,* 468 U.S. 705, 725–26, 104 S.Ct. 3296, 3308–09, 82 L.Ed.2d 530 (1984) (O'Connor, J., concurring) (citations omitted) (emphasis added); ... Consent to search a container *"is effective only when given by one with 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.... Common authority ... rests ... on mutual use of the property by persons generally having joint access or control for most purposes.'"* *Karo,* 468 U.S. at 725, 104 S.Ct. at 3308 (quoting *United States v. Matlock,* 415 U.S. 164, 171 & n. 7, 94 S.Ct. 988, 993 & n. 7, 39 L.Ed.2d 242 (1974)) (emphasis added).

The government has the burden of proving the effectiveness of a third party's consent. *Illinois v. Rodriguez,* 497 U.S. 177, 179–81, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990); *United States v. McAlpine,* 919 F.2d 1461, 1463 (10th Cir. 1990).

> *"The burden cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.* If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful without further inquiry.'"*

*United States v. Whitfield,* 939 F.2d 1071, 1075 (D.C.Cir.1991) (quoting *Rodriguez,* 497 U.S. at 188–89, 110 S.Ct. at 2801 and adding emphasis). The government must therefore come forward with persuasive evidence of both shared use *and* joint access or control of a container in order to support third party consent. *See United States v. Matlock,* 415 U.S. 164, 171, n. 7, 94 S.Ct. 988, 993, n. 7, 39 L.Ed.2d 242 (1974).

In determining whether a host has authority to consent to the search of items left in the host's home by a guest, the court should consider these factors:

(1) The type of container at issue and the degree of privacy typically accorded such an item;

(2) The type of precautions taken by the owner to manifest his subjective expectation of privacy (for example, locking the container or explicitly forbidding the host to open it);

(3) The apparent nature of the consenting party's lack of interest in the item.

*Id.* at 864.

After considering the specific facts of that case, the court of appeals concluded that the district had erred in two ways. First the district court erred in finding that because the girlfriend had control of the apartment, she automatically had control of all of the things within the apartment: "[O]wnership and control of property does not automatically confer authority over containers within it." *Id.* at 865 (citation omitted). Second, the district court held that there was no evidence negating the girlfriend's authority to search the suitcase. This holding misconceived the government's burden of proof as the government failed to demonstrate that the girlfriend had joint interest and control over the suitcase or mutual use to legitimate her consent to the search.

The Tenth Circuit also rejected the government's contention that the girlfriend had "apparent authority" within the meaning of *Rodriguez.* The information known to the police officer was insufficient to support a reasonable belief in the girlfriend's authority to authorize a search of the suitcase.

### Analysis

At the outset, even if the court did not find Deputy Croucher's testimony that he was not

trying to contact the defendant on August 26, 1996, credible, the defendant does not cite nor could the court locate any case law supporting her contention that *an unsuccessful attempt* to violate her sixth amendment rights can serve as a basis for suppression of evidence. In any event, Deputy Croucher testified that he did not want to contact Mullins on August 26, 1996, but only to retrieve the cookbook. Deputy Croucher indicated that he specifically sought to avoid contacting Mullins that day. The court finds this testimony to be credible. No violation of Mullins' Sixth Amendment rights occurred or was even intended.

The court finds no violation of Mullins' Fourth Amendment rights in Deputy Croucher's seizure of the cookbook. The cookbook was obtained by a valid consensual search authorized by Mullins' mother. The court finds nothing coercive in the manner in which Deputy Croucher treated Cherry Miller or in the manner in which the cookbook was obtained. The government has produced persuasive evidence of both shared use and joint access or control of the diaper bag. It belabors the obvious that a person in charge of an infant's care has common authority over the child's diaper bag.

The testimony of Mullins' mother largely confirmed Deputy Croucher's testimony that his request for the cookbook was not coercive in any fashion. Deputy Croucher apparently held the infant child while Mullins' mother retrieved the cookbook from the diaper bag. Mullins' mother was treated courteously and politely, and nothing in Deputy Croucher's conduct was otherwise inappropriate or overbearing.

The defendant's request to suppress the cookbook is denied.

IT IS THEREFORE ORDERED that the following motions: Defendant Dennis Lee's Motion to Join in Motions of Defendant Mullins (Dk.80) and Motion to join in Motions of Defendant Mullins (Dk.50) are granted as set forth in the body of this opinion.

IT IS FURTHER ORDERED that Defendant Dennis Lee's Motion to Join in Motions of Defendant Dennis Lee by his Previous Counsel of Record (Dk.79) is granted.

IT IS FURTHER ORDERED that Defendant Dennis Lee's Motion to Suppress Evidence [FRCP 12, 41(c), 41(e), 41(f) ] (Dk.81) is denied.

IT IS FURTHER ORDERED that the defendants' Motion for Discovery of Rule 404(b) evidence and for hearing on Rule 404(b) evidence outside the presence of the jury and in limine (Dk.53) and Motion for Disclosure by Government (Dk.41) is denied in part as moot and granted in part as set forth in the body of this opinion.

IT IS FURTHER ORDERED that the defendants' [Motion for] Bill of Particulars (Dk.49) is denied.

IT IS FURTHER ORDERED that the defendants' Motion to compel discovery regarding informants (Dk.42) is denied in part on the merits and in part as moot in light of the disclosure the government intends to provide.

IT IS FURTHER ORDERED that the defendants' Motion to compel disclosure of existence and substance of promises of immunity, leniency or preferential treatment (Dk.40) is denied as moot.

IT IS FURTHER ORDERED that Mullins' Motion to suppress statement (Dk.43) is denied.

IT IS FURTHER ORDERED that Mullins' Motion to suppress evidence (Dk.44) is denied.